IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AFFINITY EMPOWERING, Inc., <br><br> Plaintiff, <br><br> v. <br><br> EUROFINS SCIENTIFIC, Inc., <br> CLINICAL ENTERPRISE, Inc. <br><br> Defendants. | Civil Action No. 21-1843-GBW |

John V. Gorman, MORGAN LEWIS & BOCKIUS LLP, Wilmington, Delaware; Raechel Kummer, Clara Kollm, MORGAN LEWIS & BOCKIUS LLP, Washington, District of Columbia

*Counsel for Plaintiff*

Jeffrey L. Moyer, Travis S. Hunter, Nicole K. Pedi, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Edmund M. Amorosi, Jennifer A. Mahar, SMITH PACHTER McWHORTER PLC, Tysons Corner, Virginia

*Counsel for Defendants*

## MEMORANDUM OPINION

October 11, 2022
Wilmington, Delaware

_[signature]_

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

Plaintiff Affinity Empowering, Inc. (Affinity) brings this action against Defendants Eurofins Scientific, Inc. (Eurofins) and Clinical Enterprise, Inc. (CEI). In its Complaint (D.I. 2), Affinity seeks declaratory judgment as to the scope of a pilot program from the Department of Defense and damages for breach of contract and breach of the covenant of good faith and fair dealing. Pending before the Court is CEI's Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim upon Which Relief Can be Granted (D.I. 20). Since the Court finds that Affinity has failed to meet its burden to demonstrate the Court's subject matter jurisdiction over its claims, the Court will dismiss Affinity's Complaint without prejudice.

## I. BACKGROUND[1]

This case arises from CEI's termination of Affinity as a subcontractor on a Department of Defense contract to expand COVID-19 testing. In furtherance of his Administration's national COVID-19 response strategy, President Joseph R. Biden issued Executive Order 13,996 on January 21, 2021. D.I. 2 ¶¶ 1–2; Exec. Order No. 13,996, 86 Fed. Reg. 7197 (Jan. 26, 2021). The Order required various members of the President's cabinet—i.e., the Secretaries of Health and Human Services, Education, and Homeland Security—to "provide support for surveillance [COVID-19] tests for settings such as schools . . . ." *Id.* at § 3(b)(i).

The Department of Defense may enter contracts with non-traditional defense contractors for "prototype projects" under 10 U.S.C. § 4022. On February 17, 2021, the Department of Health and Human Services launched "a partnership with the [Department of Defense], to make

---

[1] In a facial challenge to subject matter jurisdiction, the Court accepts all allegations in the Complaint as true. *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016).

1

a $650 million investment in an experimental pilot program . . . authorized by" § 4022 that "expands COVID-19 testing opportunities for K-8 schools and underserved congregate settings, such as homeless shelters." D.I. 2 ¶ 4. Government officials envisioned a "public-private partnership" whereby the government set "strategic direction" and the contractors facilitated COVID-19 testing and results reporting. D.I. 2 ¶ 42 (internal quotation marks omitted).

Eurofins created CEI as a wholly owned subsidiary and used it to enter the new pilot program. D.I. 2 ¶ 23. However, CEI, Affinity alleges, was Eurofins's alter ego, and Eurofins directed CEI's operations. D.I. 2 ¶ 24. "Affinity is an expert in development and operations of complex programs in highly regulated environments" and Affinity had a "network of molecular testing labs and [a] proprietary state-of-the-art technology platform [that] enabled Affinity to quickly enter the COVID-19 testing landscape." D.I. 2 ¶ 20. Eurofins, CEI, and Affinity "developed a joint" bid to join the pilot program. D.I. 2 ¶ 55.

The Department of Defense ultimately selected the pilot program proposal that Eurofins, CEI, and Affinity developed. D.I. 2 ¶ 8. In particular, the Department of Defense "contract[ed] with CEI/Eurofins to facilitate" two of the four COVID-19 testing "Hubs" that the pilot program required. D.I. 2 ¶ 8. CEI's contract with the government is entitled "Other Transaction Authority for Prototype Agreement" and was effective May 25, 2021 (the "Government Contract," D.I. 2-6). D.I. 2 ¶ 8; D.I. 2-6. "CEI/Eurofins, in turn, subcontracted with Affinity to implement the bulk of the work related to those Hubs." D.I. 2 ¶ 8. The Service Agreement, dated May 27, 2021, governed the relationship between CEI, as contractor, and Affinity, as CEI's subcontractor (the "Service Agreement," D.I. 2-7). Affinity filed both the Government Contract and the Service Agreement in this Court under seal. The Service Agreement outlines the services Affinity was required to perform and states that CEI could not "assign, subcontract,

services directly related to" the services Affinity was to perform without Affinity's "prior written consent . . . ." D.I. 2-7 §§ 1, 16, Ex. A.

"Affinity invested substantial resources" in the pilot program "and successfully performed under the Service Agreement . . . ." D.I. 2 ¶ 9. "Yet, effective November 24, 2021[,] . . . CEI/Eurofins improperly terminated Affinity's subcontract in bad faith . . . ." D.I. 2 ¶ 11. CEI asserted as its grounds for termination that the pilot program "required Affinity to engage in traditional 'sales' of the free COVID-19 testing capacity . . . and to actually perform a certain number of COVID-19 tests." D.I. 2 ¶ 12. However, the pilot program imposed no such requirements because all parties involved anticipated that, once "schools and other underserved congregate settings" were "made aware of the free testing capacity[,]" the demand for testing would follow. D.I. 2 ¶¶ 13–16. Thus, Affinity alleges, CEI improperly terminated the Service Agreement. Further, prior to termination, CEI reassigned parts of Affinity's role to a third party, despite Affinity's express rejection of CEI's request to do so. D.I. 2 ¶¶ 126–30.

Affinity's claims sound in three counts. In Count I, Affinity seeks "declaratory judgment as to the scope and requirements of [the pilot program] under Executive Order 13,996 . . . , the Department of Defense's" authority under § 4022, "and federal common law." D.I. 2 at Count I (capitalization altered and emphasis omitted). In Count II, Affinity alleges that CEI breached the Service Agreement when it reassigned certain services that Affinity was to provide to a third party and "prematurely and improperly terminated the Service Agreement . . . ." D.I. 2 ¶¶ 167–71, 177. In Count III, Affinity alleges that, despite knowledge to the contrary, CEI "manufacture[d]" as grounds for termination of Affinity that the pilot program and the Service Agreement required Affinity to engage in "traditional 'sales[.]'" D.I. 2 ¶¶ 184–85. Thus, Affinity alleges, CEI breached the covenant of good faith and fair dealing.

3

## II. LEGAL STANDARDS

Once a court's jurisdiction is challenged, it must presume that it lacks jurisdiction unless the party asserting that jurisdiction exists can prove otherwise. *G. W. v. Ringwood Bd. of Educ.*, 28 F.4th 465, 468 (3d Cir. 2022). "'Under [Rule] 12(b)(1), a court must grant a motion to dismiss if it lacks subject-matter jurisdiction to hear a claim.'" *Shibles v. Bank of Am., N.A.*, 730 F. App'x 103, 105 (3d Cir. 2018) (citation omitted) (alteration in original). A motion to dismiss under Rule 12(b)(1) may be a "facial" attack, in which defendants argue that the allegations in the complaint are insufficient to invoke federal jurisdiction, or a "factual" attack, in which defendants question the asserted facts underlying federal court jurisdiction. *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016). If a party brings a facial attack, as here, D.I. 21 at 6, the Court must "'consider the allegations of the complaint as true[,]'" *Davis*, 824 F.3d at 346 (quoting *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006)).

"Federal courts have limited jurisdiction." *Maglioli v. All. HC Holdings LLC*, 16 F.4th 393, 413 (3d Cir. 2021). One set of cases federal courts may hear are those that arise under federal law. 28 U.S.C. § 1331. "[A] case arises under federal law when federal law creates the cause of action asserted." *Gunn v. Minton*, 568 U.S. 251, 257 (2013); *see Maglioli*, 16 F.4th at 413 (same). Further, "[c]laims founded upon federal common law arise under the laws of the United States and support federal-question jurisdiction." *E.O.H.C. v. Sec'y United States Dep't of Homeland Sec.*, 950 F.3d 177, 193 (3d Cir. 2020) (internal quotation marks and citation omitted). Federal common law displaces state statutes where "necessary to protect uniquely federal interests," *Cassirer v. Thyssen-Bornemisza Collection Found.*, 142 S. Ct. 1502, 1509 (2022) (internal quotation marks and citation omitted), and there is shown "a significant conflict between some federal policy or interest and the use of state law[,]" *Atherton v. F.D.I.C.*, 519 U.S. 213, 218 (1997) (internal quotation marks and citation omitted); *see also Linan-Faye Const.*

*Co. v. Hous. Auth. of City of Camden*, 49 F.3d 915, 920 (3d Cir. 1995) (similar); *Rhode Island v. Shell Oil Prod. Co.*, 35 F.4th 44, 54 (1st Cir. 2022) (similar).

Additionally, *Grable* instructs that "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 257 (citing *Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005)). This test is only met where, "to prove some element of a state-law claim, the plaintiff ha[s] to win on an issue of federal law." *City of Hoboken v. Chevron Corp.*, 45 F.4th 699, 709 (3d Cir. 2022). This is a "'special and small'" category of cases. *Goldman v. Citigroup Glob. Markets Inc.*, 834 F.3d 242, 249 (3d Cir. 2016) (quoting *Gunn*, 568 U.S. at 258).

### III.  DISCUSSION

Affinity has failed to meet its burden to demonstrate subject matter jurisdiction. Affinity argues that this Court has subject matter jurisdiction under 28 U.S.C. § 1331 for three reasons: First, Affinity has an implied cause of action under Executive Order 13,996 and 10 U.S.C. § 4022. D.I. 26 at 9–11. Second, Affinity's "claims . . . are governed by federal common law." D.I. 26 at 12–14. Third, Affinity's claims "necessarily raise a substantial and disputed federal issue" because its claims are based on the pilot program's scope. D.I. 26 at 14–16. However, all of Affinity's arguments fail and this Court lacks subject matter jurisdiction for the reasons set forth more fully below.

#### A.  Cause of Action Under Federal Law

Affinity cannot show that it has an implied cause of action under federal law.

Affinity first asserts that, "[f]or jurisdictional purposes, the only question is whether Affinity has an 'arguable' cause of action under federal law . . . ." D.I. 26 at 9–10. CEI does not respond to this argument from Affinity, save in a footnote. D.I. 34 at 1 n.1. "[A]rguments raised

in passing (such as, in a footnote), but not squarely argued, are considered waived." *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997). Thus, the Court will adopt the "arguable" standard that Affinity asserts by consent of the parties.

The parties agree that 10 U.S.C. § 4022 does not provide for an express federal cause of action. D.I. 21 at 7–8; D.I. 26 at 10. However, Affinity asserts that the statute arguably contains an implied cause of action. D.I. 26 at 10. "[S]ince Congress creates federal causes of action, where the text of a statute does not provide a cause of action, there ordinarily is no cause of action." *Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 709 (3d Cir. 2020) (internal quotation marks and citation omitted). "[A]n implied right of action exists if 'a statute . . . manifest[s] Congress's intent to create (1) a personal right, and (2) a private remedy.'" *Migliori v. Cohen*, 36 F.4th 153, 161 n.48 (3d Cir. 2022) (quoting *Three Rivers Ctr. for Indep. Living v. Housing Auth. of City of Pittsburgh*, 382 F.3d 412, 421 (3d Cir. 2004)) (alterations in original). Initially, the Court must "analyze the statute's text and structure to determine whether it contains rights-creating' language. [The Court] may also look to the legislative history and other indicia of legislative intent." *Bakos v. Am. Airlines, Inc.*, 748 F. App'x 468, 473–74 (3d Cir. 2018) (internal quotation marks and citations omitted). "When 'right- or duty-creating language' is not explicitly included in a statute, a court will rarely imply congressional intent to create a private right of action." *Spencer Bank, S.L.A. v. Seidman*, 309 F. App'x 546, 549 (3d Cir. 2009) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 n.3 (2002)).

Affinity argues that this Court should, instead, apply the test outlined in *American Trucking*, D.I. 26 at 10, which, in turn, derives its test from the Supreme Court's decision in *Cort v. Ash, see Am. Trucking Ass'n, Inc. v. Delaware River Joint Toll Bridge Comm'n*, 458 F.3d 291, 297 (3d Cir. 2006) (citing *Cort v. Ash*, 422 U.S. 66, 78 (1975)). However, "[t]he Supreme

6

Court's decision in *Alexander v. Sandoval*, 532 U.S. 275[] . . . (2001), strongly suggests that the Court has abandoned the *Cort v. Ash* test[,]" and the Third Circuit has rejected the four-part test from *American Trucking*. *Wisniewski v. Rodale, Inc.*, 510 F.3d 294, 299–301 (3d Cir. 2007) (citation omitted). Thus, the Court will use the two-part test adopted in *Sandoval*.

The Court first finds that 10 U.S.C. § 4022 does not contain rights-creating language that would evidence Congress's intent to create a personal right. "As background, Congress granted the Department of Defense the authority to enter into other transactions ('OT'). OTs are agreements that are not procurement contracts, cooperative agreements, or grants." *Space Expl. Techs. Corp. v. United States*, 144 Fed. Cl. 433, 435 (2019) (citing, among others, 10 U.S.C. § 2371b). Section 4022 allows for such OTs. *See id.*; William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, § 1841, 134 Stat. 3388, 4243 (2021); National Defense Authorization Act for Fiscal Year 2022, Pub. L. No. 117-81, § 1701, 135 Stat. 1541, 2151 (2021) (transferring § 2371b to § 4022 in two steps). Section 4022 permits certain officials in the Department of Defense to

> carry out prototype projects that are directly relevant to enhancing the mission effectiveness of military personnel and the supporting platforms, systems, components, or materials proposed to be acquired or developed by the Department of Defense, or to improvement of platforms, systems, components, or materials in use by the armed forces.

10 U.S.C. § 4022(a)(1). The statute requires the sign-off of increasingly senior officials for more expensive projects, *id.* § 4022(a), directs the government to use "competitive procedures" "[t]o the maximum extent practicable" when it awards the contracts, *id.* § 4022(b)(2), requires that the Comptroller General be able to access certain information about projects, *id.* § 4022(c), permits contract renewals (i.e., "follow-on" contracts), *id.* § 4022(f), applies ethics rules, *id.* § 4022(h), and permits a contract awardee to provide a prototype to another government contractor, *id.* §

4022(g). The statute also prohibits the Department of Defense from entering a contract for a prototype project under § 4022 unless the project meets one of four conditions (e.g., "at least one nontraditional defense contractor" participates; "exceptional circumstances justify" using procedures not "feasible or appropriate under a contract"). *Id.* § 4022(d)(1).

None of these provisions evidence the intent to create rights or remedies for private parties. Rather, the statute allows Department of Defense officials to grant flexible procurement contracts to non-traditional government contractors. The statute also contains no language that references private remedies for parties. For example, Section 4022 contains no "comprehensive remedial scheme." *Wisniewski*, 510 F.3d at 303. Affinity points to no legislative history that would contradict the statute's plain text, and the Court has not found any. *See* National Defense Authorization Act for Fiscal Year 2016, Pub. L. No. 114-92, § 815, 129 Stat. 726, 893 (adding a provision entitled "authority of the Department of Defense to carry out certain prototype projects"). Affinity argues that "certain aspects of [§ 4022] are intended to benefit entities, like Affinity, who 'participate[] in the performance of' agreements authorized by that statute." D.I. 26 at 10 (quoting 10 U.S.C. § 4022(c)–(d)) (alterations in original). However, whether Affinity is correct that it could bring suit against a private party to obtain such benefits, Affinity points to no particular benefit that the statute offers. Therefore, the Court finds that § 4022 does not grant an implied right of action.

The Court next finds that Executive Order 13,996 does not grant it subject matter jurisdiction. Affinity asserts that the Order is a law for jurisdictional purposes under 28 U.S.C. § 1331 because the Order states that it is authorized under "the laws of the United States of America." D.I. 26 at 11; Exec. Order 13,996, *supra*. CEI responds that the Order both fails to create a private right of action and does not constitute federal law for purposes of § 1331. D.I.

8

34 at 5. Section 1331 grants this Court jurisdiction over "civil actions arising under the . . . laws, . . . of the United States." This includes executive orders "designed to implement and effectuate the statutes under which they were promulgated . . . ." *Loc. 1498, Am. Fed'n of Gov't Emp. v. Am. Fed'n of Gov't Emp., AFL/CIO*, 522 F.2d 486, 491 (3d Cir. 1975); *see also Chasse v. Chasen*, 595 F.2d 59, 61–62 (1st Cir. 1979) (explaining that "validly issued administrative regulations or executive orders may be treated as 'laws of the United States' under § 1331(a)" after the court weighs "the statutory authority for promulgation" and "the formality of the promulgation"); *Terry v. Northrup Worldwide Aircraft Servs., Inc.*, 786 F.2d 1558, 1560 (11th Cir. 1986) (asking whether the executive order "'was entered into pursuant to authority conferred by federal statute'" (citation omitted)); *Kuhn v. Nat'l Ass'n of Letter Carriers, Branch 5*, 570 F.2d 757, 761 (8th Cir. 1978) ("[P]residential proclamations and orders have the force and effect of law when issued pursuant to a statutory mandate or delegation of authority from Congress." (internal quotation marks and citation omitted)).

Executive Order 13,996 cites only one statute for its authority, 3 U.S.C. § 301. Affinity points to no other statute from which the Order derives its authority. D.I. 26 at 11. Section 301 provides that the President "is authorized to designate and empower" various federal officials "appointed by and with the advice and consent of the Senate" "to perform without approval . . . any function which is vested in the President by law" or any function that requires presidential approval. 3 U.S.C. § 301. Executive Order 13,996, for its part, establishes a "COVID-19 Pandemic Testing Board" and directs various senior officials to "facilitate the provision of COVID-19 testing free of charge to those who lack comprehensive insurance coverage" and to "provide support for surveillance tests for settings such as schools . . . ." Exec. Order No. 13,996, *supra*, §§ 2, 3. The Complaint alleges that the Departments of Defense and of Health

9

and Human Services launched "an experimental pilot program . . . authorized by" § 4022 that "expands COVID-19 testing opportunities for K-8 schools and underserved congregate settings, such as homeless shelters." D.I. 2 ¶ 4. Affinity participated in the pilot program as part of "Team Eurofins" and entered into the Service Agreement "[i]n connection with" the Government Contract. D.I. 2 ¶¶ 8, 55, 65, 76–78; D.I. 2-7 § 1. The designs of Executive Order 13,996 and of the pilot program do not suggest an attempt to implement or effectuate § 301. In other words, § 301 *permitted* Executive Order 13,996's adoption, but the Order did not further § 301's implementation (e.g., it did not outline rules for permissible delegations under § 301). As such, the Order does not grant federal question jurisdiction under § 1331.

Affinity has failed to meet its burden to show that either § 4022 or Executive Order 13,996 grants this Court subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

**B.    Federal Common Law**

This action also does not arise under federal common law. "[B]ecause federal common law is federal law, disputes governed by it arise under the laws of the United States." *E.O.H.C.*, 950 F.3d at 192 (cleaned up). Federal common law exists in "limited areas" where "the rule is necessary to protect uniquely federal interests[,]" *Matrix Distributors, Inc. v. Nat'l Ass'n of Boards of Pharmacy*, 34 F.4th 190, 197 (3d Cir. 2022) (internal quotation marks and citation omitted), or where "substantial rights or duties of the United States hinge on [an action's] outcome[,]" *Miree v. DeKalb Cnty., Ga.*, 433 U.S. 25, 31 (1977). One example is "cases concerned with the rights and obligations of the United States" such as "when the United States is a party to a contract . . . ." *E.O.H.C.*, 950 F.3d at 192 (internal quotation marks and citations omitted). Further, federal common law only applies where "a significant conflict exists between an identifiable federal policy or interest and the operation of state law . . . ." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 507 (1988) (cleaned up); *see also Atherton*, 519 U.S. at 218.

10

Affinity asserts that "[t]his case arises in one of those rare, uniquely federal areas—a vital federal program created to combat a nationwide, once-in-a-lifetime pandemic" and that "[a]pplying state law to Affinity's claims would seriously undermine federal interests in uniformity, predictability, and the supremacy of the federal interest." D.I. 26 at 12. Affinity argues that determining whether the Government Contract "obligated Affinity to perform in the way CEI[] wrongly claims it did will necessarily impact how [the Government Contract] is interpreted." D.I. 26 at 13. Additionally, Affinity raises the specter of "[d]ivergent state court interpretations" that could "undermine the National Strategy to combat the COVID-19 pandemic . . . ." D.I. 26 at 13–14. The Ninth Circuit, as Affinity points out, D.I. 26 at 12, has held that federal common law governs contract disputes over a subcontract between private parties to a government contract, *see New SD, Inc. v. Rockwell Int'l Corp.*, 79 F.3d 953, 955 (9th Cir. 1996). However, other courts have rejected the Ninth Circuit's analysis as overbroad and instead found that a subcontract must implicate government rights or interests—or expose the government to "some potential loss"—for federal common law to apply. *See Woodward Governor Co. v. Curtiss Wright Flight Sys., Inc.*, 164 F.3d 123, 128 (2d Cir. 1999).

The Court finds Affinity's arguments unavailing. First, if the Department of Defense disagreed with state courts' interpretations of the Government Contract, the Department could simply revise the offending language and renew or reissue the contract on more agreeable terms. Thus, inconsistent state court interpretation presents little risk to the federal government as to other or future agreements. Second, states' shared interest in the pandemic's containment shows that federal interests are far from "unique[]." *See, e.g., Delaware's COVID-19 Response*, Del. Div. Pub. Health (Accessed Sept. 22, 2022), https://coronavirus.delaware.gov/; *Seventh Extension of Declaration of a Public Health Emergency for the State of Delaware*, Del. Exec.

11

Dept. (Sept. 15, 2022), https://governor.delaware.gov/wp-content/uploads/sites/24/2022/09/Seventh-Extension-of-PHE_9.15.22_Signed.pdf (extending Delaware's COVID-19 public health emergency). Third, Affinity asserts no conflict between state law and federal common law as it pertains to Affinity's claims. Indeed, the Service Agreement at issue selects both Delaware law and applicable provisions of federal law. D.I. 2-7 § 19. In other words, the parties anticipated resolution of at least some disputes related to the Service Agreement to occur under Delaware law. Therefore, Affinity has failed to meet is burden to show that its claims arise under federal common law.

### C. State Law *Grable* Claims

Finally, Affinity cannot meet its burden to show that this is one of the "'special and small'" number of cases that arises exclusively under state law that federal courts will still hear. *Goldman*, 834 F.3d at 249 (quoting *Gunn*, 568 U.S. at 258). The Supreme Court has instructed, under the test articulated in *Grable*, that "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 257 (citing *Grable & Sons Metal Prod.*, 545 U.S. at 314). Proof of an element of the state law claim must turn on federal law, *City of Hoboken*, 45 F.4th at 709, and the case must raise an issue substantial "to the federal system as a whole[,]" *Gunn*, 568 U.S. at 260. Here, the Court does not find for Affinity as to either Count II, breach of contract, or Count III, breach of the covenant of good faith and fair dealing, under *Grable*.

To begin, "[t]he Declaratory Judgment Act does not . . . provide an independent basis for subject-matter jurisdiction; it merely defines a remedy." *Allen v. DeBello*, 861 F.3d 433, 444 (3d Cir. 2017) (footnote omitted). Affinity brings Count I under Executive Order 13,996, 10 U.S.C. § 4022, and federal common law. *See* D.I. 2 at Count I. Since the Court has found it lacks

jurisdiction under Executive Order 13,996, § 4022, and federal common law, *see supra*, the Court has no jurisdiction as to Count I and will only apply *Grable* to Count II and Count III.

Affinity argues that Count II and Count III necessarily raise a disputed federal issue because "[t]he primary question in all of Affinity's claims relates to the requirements of" the pilot program. D.I. 26 at 14. However, Affinity's breach of contract claim, Count II, mentions the pilot program only to state (i) the "intent" of the parties when they entered the Service Agreement and (ii) that the Service Agreement was to last as long as the Government Contract lasted. D.I. 2 ¶¶ 164, 174–75. Otherwise, Affinity alleges only the breach of "the plain language of the Service Agreement . . . ." D.I. 2 ¶¶ 165, 174. "[T]he interpretation of private contracts is ordinarily a question of state law . . . ." *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 474 (1989). Thus, Count II does not "necessarily raise" an issue of federal law, much less a disputed issue.

Count III alleges that, while neither the pilot project nor the Service Agreement "require traditional 'sales,' as opposed to marketing and outreach[,]" CEI knowingly used Affinity's failure to make sales as a "manufacture[d] purported grounds for termination for cause" of the Service Agreement. D.I. 2 ¶ 185. A claim only falls under *Grable* if, "to prove some *element* of a state-law claim, the plaintiff had to win on an issue of federal law." *City of Hoboken*, 45 F.4th at 709 (emphasis in original); *see also Grable*, 545 U.S. at 314–15 (noting that an "essential element" of Grable's state law claim was whether he received the notice that federal law requires). Here, the Government Contract specifies CEI's obligations within the pilot project, *see, e.g.*, D.I. 2-6 § C.1.d. ("[CEI] shall carry out the Prototype Project in accordance with the Statement of Work, attached as Appendix A."); *id.* at App'x A1, A2 (outlining, e.g., coordination, laboratory network, and schedule requirements), and the Service Agreement

13

applies only to Affinity's provision of services "related to specimens collected and prepared for testing pursuant to the [Government Contract,]" D.I. 2-7 at 1. Since Count III turns on whether "Affinity was required to engage in sales[,]" D.I. 2 ¶ 185, the Court finds it likely that Count III will also turn on contract interpretation (i.e., interpretation of the Service Agreement and of the Government Contract) and, therefore, is unlikely to raise a disputed federal issue.

However, even if Affinity raises a federal issue, the issue is not substantial. Affinity explains that this case presents a substantial federal issue because its resolution would require that the Court "prob[e] the judgments of federal executive officers" and "examin[e] the scope of the federal government's response to the COVID-19 pandemic." D.I. 26 at 15. First, Count II asserts breach of the Service Agreement and Count III is based upon CEI's knowledge of the Government Contract's requirements. D.I. 2 at Count II, Count III. If the two contracts impose clear and unambiguous requirements, the Court would not need to consider extrinsic evidence at all. *See Cox Commc'ns, Inc. v. T-Mobile US, Inc.*, 2022 WL 619700, at *5 (Del. Mar. 3, 2022) ("[Delaware's] approach places great weight on the plain terms of a disputed contractual provision . . . ."). Even if the Court had to resort to extrinsic evidence, the extrinsic evidence would likely come from the parties, since Count II relates only to breach of a contract between the parties and Count III may require investigating CEI's (not the Department of Defense's) state of mind. Finally, the Complaint clarifies that Executive Order 13,996 was only one out of "a number of Executive Orders" issued to combat the pandemic, D.I. 2 ¶ 2, and the pilot program targeted only one or two of at least seven goals that Executive Order 13,996, alone, pursued, Exec. Order No. 13,996, *supra*, § 1. Even if the *entire* national strategy to combat COVID-19 were important to "the federal system as a whole[,]" *Gunn*, 568 U.S. at 260, it is unclear why this small portion of it would be. Therefore, Affinity raises no substantial federal issue.

Finally, Affinity argues that the federal-state balance would not suffer disruption because a case related to "a new and unprecedented federal program that state courts have never been involved with" is "unlikely to occur very often." D.I. 26 at 16. However, Affinity ignores that Delaware has an interest in the interpretation of the Service Agreement, since it invokes Delaware law. *See* D.I. 2-7 § 19. *See generally Illinois Nat. Ins. Co. v. Wyndham Worldwide Operations, Inc.*, 653 F.3d 225, 231 (3d Cir. 2011) ("When interpreting state law, we follow a state's highest court . . . ."). Second, it is hardly rare that federal programs are called "new and unprecedented." *See, e.g., Elementary and Secondary School Emergency Relief Fund*, Off. Elementary & Secondary Ed. (July 21, 2022), https://oese.ed.gov/offices/education-stabilization-fund/elementary-secondary-school-emergency-relief-fund/ (noting coronavirus relief bill's "unprecedented $1.9 trillion package of assistance measures"); *Biden-Harris Administration, USDOT Make an Unprecedented $1.4 Billion in Rail Grants Available Through Bipartisan Infrastructure Law*, U.S. Dept. of Transportation (Sept. 1, 2022), https://www.transportation.gov/briefing-room/biden-harris-administration-usdot-make-unprecedented-14-billion-rail-grants-available; *Trump Administration Accomplishments*, Trump White House (Jan. 2021), https://trumpwhitehouse.archives.gov/trump-administration-accomplishments/ (listing "unprecedented reforms" related to "prescription drugs"; "[u]nprecedented support for law-enforcement"; "unprecedented transparency in Medicare and Medicaid data"; and "unprecedented attention and support to combat the opioid crisis"). Thus, the Court cannot accept Affinity's assertion that similar requests to assert federal jurisdiction over classic state law contract claims would be "rare."

Therefore, Count II and Count III fail the *Grable* test.

\* \* \*

In summary, Affinity has the burden of proof to show jurisdiction, and Affinity has failed to meet that burden. The Court finds that 10 U.S.C. § 4022 does not create a private right of action; that Executive Order 13,996 was not designed to implement § 4022 or 3 U.S.C. § 301; that federal common law does not govern Affinity's claims; and that Affinity cannot invoke this Court's jurisdiction under *Grable* for Affinity's state law claims. Thus, Affinity has failed to meet its burden to establish this Court's jurisdiction, and the Court will dismiss Count I, Count II, and Count III for lack of subject matter jurisdiction.

### IV. CONCLUSION

For the reasons discussed above, the Court will grant CEI's motion to dismiss for lack of subject matter jurisdiction without prejudice. *In re Orthopedic "Bone Screw" Prod. Liab. Litig.*, 132 F.3d 152, 155 (3d Cir. 1997) (finding that the "disposition" of "a case, over which the court lacks subject matter jurisdiction, . . . will, however, be without prejudice" (citations omitted)); *see Patel v. Allstate New Jersey Ins. Co.*, 648 F. App'x 258, 262–63 (3d Cir. 2016) (vacating dismissal with prejudice because court lacked jurisdiction to decide merits).

The Court will enter an Order consistent with this Memorandum Opinion.